IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

WILLIAM SEAN WILKINS                                    PLAINTIFF

       v.                       Civil No. 09-5204

SHERIFF KEITH FERGUSON;
CAPTAIN ROBERT HOLLY; and
DR. JOHN HUSKINS                                    DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Plaintiff filed this civil rights action pursuant to the provisions of 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis.*

Plaintiff is currently incarcerated in the North Central Unit of the Arkansas Department of Correction. The events that are the subject of this action occurred while he was incarcerated in the Benton County Detention Center (BCDC) from February 28, 2009, to March 3, 2010. Plaintiff maintains he was denied adequate medical care for injuries sustained in a slip and fall. Plaintiff names as Defendants: Sheriff Keith Ferguson; Captain Robert Holly; and Dr. John Huskins.

A motion for summary judgment has been filed on behalf of the Defendants (Docs. 32, 33 & 34). To assist Plaintiff in responding to the summary judgment motion, a questionnaire was prepared (Doc. 36). Plaintiff filed a timely response to the questionnaire (Doc. 39). The summary judgment motion is now ready for decision.

**1. Background**

On February 28, 2009, Plaintiff was booked into the Benton County Jail as a pre-trial felony detainee on charges of manufacturing a controlled substance (methamphetamine).

AO72A
(Rev. 8/82)

*Plaintiff's Response* (Doc. 39) at ¶ 1 (hereinafter *Resp.*). Plaintiff completed a medical intake form at the time of booking, and indicated he had narcolepsy. *Id.* at ¶ 2. He noted that he was under the care of Dr. Little and currently taking Adderall.[1]

On March 27th, Plaintiff slipped and fell coming out of the shower.[2] *Resp.* at ¶ 8(A). He tripped because of a broken shower shoe and attempted to break his fall with his right hand. *Id.* The following day, Plaintiff requested medical care because he was experiencing sharp pain on his left side and a numbing sensation in the thumb area of his right hand. *Id.* at ¶ 4 & ¶ 8(B).

Plaintiff was seen by Dr. Huskins the following day. *Resp.* at ¶ 5(A); *Defendants' Exhibit* 1 at pg. 3 (hereinafter *Defts' Ex.*). Dr. Huskins' examination of the hand was negative. *Defts' Ex.* 1 at pg. 3. Plaintiff did have high blood pressure and was started on Inderal. *Id.* Plaintiff was also given Aleve twice daily for pain. *Id.* On March 31st, Plaintiff was seen again and the Inderal was increased. *Resp.* at ¶ 6.

On April 4th, Plaintiff requested medical care, complaining that his right hand was getting worse to the point that he could not a hold pencil. *Resp.* at ¶ 7. In response, he was scheduled to see the doctor. *Id.* Plaintiff was seen by Dr. Huskins on April 7th and prescribed Aleve for pain. *Id.* at ¶ 9(A). In addition, Plaintiff's blood pressure medication was changed from Inderal to Lopressor. *Id.* at ¶ 9(B).

---

[1] A combination of dextroamphetamine and amphetamine used to treat Narcolepsy, a sleep disorder that causes excessive daytime sleepiness and sudden attacks of sleep. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601234.html (accessed August 24, 2011).

[2] The complaint listed the date of the fall as April 6, 2009. However, it appears clear from the summary judgment materials that the fall occurred on March 27th.

On April 11th, Plaintiff requested medical care. *Resp.* at ¶ 10. He complained that his hand was worse and he had lost motor skills. *Id.* He was examined by Dr. Huskins on April 13th. *Defts' Ex.* 1 at pg. 3. Plaintiff complained he was still having some symptoms of dysfunction; however, Dr. Huskins' examination was negative. *Id.* Dr. Huskins prescribed prednisone, a steroid anti-inflammatory. *Id.*

On April 16th, Plaintiff requested that x-rays be taken of his right hand and thumb, and complained that the large muscle at the base of his thumb no longer functioned properly. *Resp.* at ¶ 12. He was seen by Dr. Huskins on the 17th and prescribed Flexeril,[3] a muscle relaxer, and Aleve. *Defts' Ex.* 1 at pgs. 3-4.

On April 17th, Plaintiff submitted a medical request stating that he was experiencing muscle atrophy and decomposition in his hand. *Resp.* at ¶ 15. He complained that he was being deliberately denied medical care. *Id.* In response, the nurse noted Plaintiff had been seen by the doctor that morning. *Id.*

On April 18th, Plaintiff submitted a grievance complaining that the medical staff was deliberately denying him medical care. *Resp.* at ¶ 16(A). He indicated that he had explained to the doctor and medical staff that he was experiencing atrophy and muscle decomposition. *Id.* In response, Captain Holly spoke to the Plaintiff in the control booth and stated that the grievance would be treated like a medical request. *Id.* at ¶ 16(B).

On April 20th and April 21st, Plaintiff submitted additional requests complaining that his hand was getting worse, the atrophy was spreading, and he believed he might have nerve

---

[3] Plaintiff states a number of times in his summary judgment response that he does not remember being prescribed Flexeril. *See e.g., Resp.* at ¶ 13 & ¶ 30. Flexeril is the brand name for cyclobenzaprine, a muscle relaxant. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html (accessed August 24, 2011). The medication logs do indicate Plaintiff received cyclobenzapine. *Defts' Ex.* 7.

damage. *Resp.* at ¶ 17 & ¶ 18. On April 22nd, Plaintiff was seen by Dr. Huskins who began a neurological work-up. *Id.* at ¶ 19. The possibility of a having a nerve conduction study done was discussed and Dr. Huskins determined Plaintiff should be referred to a neurosurgeon. *Id.*

That same day, Deputy Ellis Switzer reported that he observed Plaintiff using his right hand to carry a cup and a food tray. *Defts' Ex.* 5 at pg. 1. Nurse Marsha Smith noted on Plaintiff's medical chart that she had observed the Plaintiff holding a glass, making a sandwich, holding a piece of paper, picking up his lunch tray, and scratching his face with his right hand. *Defts' Ex.* 6 at pg. 3.

On April 26th, Plaintiff requested that someone with knowledge on the medical staff examine the situation with his hand. *Resp.* at ¶ 22. In response, Plaintiff was seen by Dr. Huskins the following day. *Defts' Ex.* 1 at pg. 4. Dr. Huskins' examination revealed no motor sensory loss and good pulses. *Id.* Plaintiff, however, states the examination revealed that he could not move his thumb in a normal way. *Resp.* at ¶ 23.

On April 27th, Plaintiff requested medical care for throbbing pain and a swollen ankle. *Defts' Ex.* 4 at pg. 28. He also complained that he was hearing voices in his head, and could not differentiate between reality and dreamland. *Id.* On April 28th, Plaintiff asked for a refill of his Naproxen because he was having sharp pain in his hand. *Resp.* at ¶ 25. He was seen by Dr. Huskins on April 29th for complaints of ankle pain. *Defts' Ex.* 1 at pg. 4. Dr. Huskins' notes indicate his examination of the ankle was negative. *Id.* Aleve was prescribed. *Id.* Plaintiff asserts that he had previously had surgery on this ankle and his ankle had been fused leaving him with very limited movement. *Resp.* at ¶ 26.

On May 5th, Plaintiff submitted a medical request asking if the doctor had found out if he was going to have surgery to fix the pinched nerve in his neck that was causing the muscle to atrophy in his right hand. *Resp.* at ¶ 27. In response, Plaintiff was examined by Dr. Huskins the following day. *Id.* at ¶ 28. Dr. Huskins ordered neck and chest x-rays and an electromyogram (EMG) nerve conduction studies. *Id.*

Dr. Huskins next evaluated Plaintiff's hand on May 22nd. *Defts' Ex.* 1 at pgs. 4-5. He continued the Aleve but discontinued the Flexeril. *Id.* On May 27th, Plaintiff underwent a nerve conduction test performed by Dr. Jhablall Balmakund at Rogers Medical Center. *Resp.* at ¶ 34(A). Plaintiff was evaluated for right median and ulnar mononeuropathies and cervical radiculopathy. *Id.* at ¶ 34(B). Nerve conduction studies, needle examination of representative muscles, and EMG/NCS results were all abnormal. *Id.* The results of the studies showed evidence of radiculopathy, chronic, affecting C8 and T1. *Id.* Plaintiff reported that he had a current prescription for Naproxen. *Defts' Ex.* 9 at pg. 4. Dr. Balmakund indicated he would consider doing an MRI of Plaintiff's cervical spine but since Plaintiff's symptoms were stable and he had reported no pain, Dr. Balmakund recommended observing Plaintiff for another one to two months. *Id.* at pg. 8. Plaintiff was to return on an as needed basis. *Id.* According to Plaintiff, he reported neck pain to Dr. Balmakund. *Resp.* at ¶ 34(D).

On May 28th, a chest x-ray was taken and the results were normal. *Resp.* at ¶ 35. A spinal x-ray was also taken which revealed intervertebral body disc space narrowing in the lower cervical spine, most notable at the C6-C7 level. This was interpreted to be evidence of degenerative disc disease involving the lower cervical spine. *Defts' Ex.* 9 at pg. 11. The x-ray also showed a normal lateral cervical spine, no prevertebral swelling, and no evidence of acute injury. *Id.*

-5-

From May through August, Plaintiff was seen by Dr. Huskins for a variety of complaints including colds, neck pain, a rash, foot pain, dizziness, anxiety accompanied by chest pain, shortness of breath and a cough, a request for a vegetarian diet, joint pain, knee pain, high blood pressure, and swelling in the right eyelid. *Defts' Ex.* 1 at pgs. 4-6; *Resp.* at ¶¶ 37-39, 41-46, 48-51.

On September 1st, Plaintiff requested medical treatment because his right hand was numb and he had limited thumb movement. *Resp.* at ¶ 52. In response, Plaintiff was seen by Dr. Huskins on September 4th. *Defts' Ex.* 1 at pg. 6. Dr. Huskins' notes for that day only indicate Plaintiff came in for a follow-up on his wrist. *Defts' Ex.* 1 at pg. 6. According to Plaintiff, Dr. Huskins noted that the Plaintiff still had limited mobility in his thumb and hand. *Resp.* at ¶ 54.

On September 11th, Dr. Huskins examined Plaintiff for complaints of ankle pain. *Resp.* at ¶ 56. He noted that Plaintiff's range of motion was intact and that there was no instability. *Defts' Ex.* 1 at pg. 6. He prescribed Tylenol. *Id.* Plaintiff asserts that his range of motion could not be intact because his ankle has been fused and his arch broken. *Id.*

On September 18th, Dr. Huskins noted Plaintiff's wrist was improved. *Defts' Ex.* 1 at pg. 7. Plaintiff asserts that his wrist had not improved. *Resp.* at ¶ 58(A).

On October 1st, Plaintiff requested medical treatment because his hand and thumb were not getting better. *Resp.* at ¶ 61. Plaintiff believed he was going to need some type of surgery. *Id.* In response, he states the nurse advised him that it was out of their hands since he had been sentenced to a term of imprisonment at the Arkansas Department of Correction (ADC). *Id.* On October 7th, Dr. Huskins examined Plaintiff's hand and continued Aleve for pain. *Id.* at ¶ 62.

On October 9th, Plaintiff was examined by Dr. Huskins for complaints of lower back pain. *Defts' Ex.* 1 at pg. 7. He noted Plaintiff's range of motion was intact and that leg raise and deep tendon reflex tests were negative. *Id.* He treated Plaintiff with Tylenol. *Id.* On October 18th, Plaintiff again asked to see the doctor because of problems with his back. *Defts' Ex.* 4 at pg. 15. Plaintiff was seen on October 19th and prescribed Tylenol. *Defts. Ex.* 1 at pg. 7.

On November 4th, Plaintiff requested medical care for his ankle and hand. *Defts' Ex.* 4 at pg. 16. Dr. Huskins saw Plaintiff that day for complaints of leg pain. *Defts' Ex.* 1 at pg. 7. The examine was negative. *Id.* Plaintiff was treated with prednisone and Tylenol. *Id.*

Plaintiff was transferred to the ADC on March 3, 2010. *Resp.* at ¶ 72. After his transfer to the ADC, Plaintiff states he has had two x-rays of his hand taken. *Id.* at ¶ 71. He is also in the process of being scheduled for a magnetic resonance imaging (MRI). *Id.*

Plaintiff was asked to describe how the Defendants exhibited deliberate indifference to his medical needs. *Resp.* at ¶ 72. Plaintiff asserts that Defendants could see that he had some kind of nerve damage but did not take him back to Dr. Balmakund to be seen again even though he was at the BCDC until March of 2010. *Id.* After he was sentenced on September 21, 2009, Plaintiff states he was told he was no longer under the care of the BCDC. *Id.* He feels that they just "passed the problem over to [the ADC]." *Id.* In fact, Plaintiff states Dr. Huskins told him that he was "no longer Benton County['s] problem" and was ADC property. *Id.* at ¶ 73.

With respect to Captain Holly, after the one talk they had, Plaintiff states that Captain Holly failed to check on the Plaintiff. *Resp.* at ¶ 74. As he was hurt at the BCDC, Plaintiff feels the problem should have been resolved by Benton County. *Id.*

AO72A
(Rev. 8/82)

With respect to Sheriff Ferguson, Plaintiff states he did not even take the time to speak with the Plaintiff or make sure he was taken care of. *Resp.* at ¶ 75. Plaintiff believes he should have been "taken care of" whether he was ADC property or not. *Id.* In fact, Plaintiff believes Defendants waited until he was sentenced to deal with the problem so they could "get out of responsibility." *Id.* at ¶ 76(A).

### 2. Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, the Court cannot weigh the evidence or resolve disputed issues of fact in favor of the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

"[A] disputed fact alone will not defeat summary judgment, rather there must be a genuine issue of material fact. To be material, a fact must affect the outcome of the suit under the governing law." Torgerson v. City of Rochester, 643 F.3d 1031, 1051 (8th Cir. 2011)(internal quotation marks and citations omitted).

### 3. Discussion

Defendants maintain they are entitled to judgment in their favor for the following reasons: first, they have been sued in their official capacities only and there is no evidence of any unconstitutional Benton County policy or custom; second, they maintain there is no evidence of deliberate indifference on their part; third, they argue Plaintiff cannot establish he suffered any actual injury and therefore may not proceed with this action. The arguments will be addressed in turn.

-8-

## A. Individual versus Official Capacity Claims

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. In order to state a claim under §1983, plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution. West v. Atkins, 487 U.S. 42, 48 (1988); Dunham v. Wadley, 195 F.3d 1007, 1009 (8th Cir.1999). The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983. Daniels v. Williams, 474 U.S. 327, 328 (1986); Davidson v. Cannon, 474 U.S. 344, 347 (1986).

Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or claims may be stated against a defendant in both his individual and his official capacities. In Gorman v. Bartch, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the distinction between individual and official capacity suits. As explained by the Gorman case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. *See Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991). Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. *Id.* 502 U.S. at 24-27, 112 S. Ct. at 361-62 (1991). Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. *Id.* 502 U.S. at 25-27, 112 S. Ct. at 362.

*Id.* at 914.

AO72A
(Rev. 8/82)

The Eighth Circuit has advised plaintiffs to specifically plead whether government agents are being sued in their official or individual capacities to ensure prompt notice of potential personal liability. Nix v. Norman, 879 F.2d 429, 431 (8th Cir. 1989); see also Andrus v. Arkansas, 197 F.3d 953, 955 (8th Cir. 1999). When the plaintiff fails to state whether he is suing an official in his individual capacity, the Eighth Circuit has construed the claim to be against the defendant in his official capacity only. See Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999).

In this case, Plaintiff is proceeding *pro se*. The Court has a duty to liberally construe complaints filed by *pro se* plaintiffs. Yates v. Baldwin, 633 F.3d 669, 675 (8th Cir. 2011). I believe liberal construction is appropriate given that the distinction between official and individual capacity claims is difficult for even those with legal training to understand, see e.g., Vanhorn v. Oelschlager, 502 F.3d 775, 779 (8th Cir. 2007)(state officials misconstrued the differences between official and individual capacity claims and the immunities available). The complaint will therefore be construed to include claims against Defendants in both capacities. *Id*.

### B. Denial of Medical Care

Under both the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment, "deliberate indifference is the appropriate standard of culpability for all claims that prison officials failed to provide . . . detainees with adequate . . . . medical care." Hartsfield v. Colburn, 491 F.3d 394, 396 (8th Cir. 2007)(internal quotation omitted); see also Butler v. Fletcher, 465 F.3d 340, 344 (8th Cir. 2006). "To establish deliberate indifference, [Plaintiff] must show that [he] suffered from one or more objectively serious medical needs, and that the [Defendants] acted with a sufficiently culpable state of mind, namely, that they

actually knew of, but deliberately disregarded, [Plaintiff's] medical needs." Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009)(internal quotation marks and citations omitted).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." Popoalii v. Correctional Med. Servs, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

Here, Plaintiff's claim is premised on the alleged failure of the Defendants to provide adequate treatment for his hand. He believes Defendants deliberately delayed in providing him with treatment until he was sentenced to a term of imprisonment at the ADC. Plaintiff believes surgery is necessary.

Deliberate indifference may be manifested by the intentional delay in the provision of medical care. Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). The denial or delay of medical care, when based on non-medical factors such as the cost of the medical care, may also constitute deliberate indifference. See e.g., Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987). While the cost of various treatment alternatives may be considered, "medical personnel cannot simply resort to an easier course of treatment that they know is ineffective." Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006).

In this case, on April 22nd, Dr. Huskins decided Plaintiff should be referred to a neurosurgeon. On May 27th, Plaintiff underwent a neurological evaluation. The results of the testing indicated there were abnormalities with respect to Plaintiff's right hand. Dr. Balmakund concluded it was appropriate to continue to observe Plaintiff for one to two months

but also noted that he would consider doing a MRI of Plaintiff's cervical spine. Plaintiff was to return on an as needed basis.

Although Plaintiff was seen by Dr. Huskins on several occasions after May 27th, in connection with complaints about his hand, Plaintiff was not scheduled for a return visit to Dr. Balmakund and no MRI of Plaintiff's cervical spine was done. In fact, no changes occurred with respect to Plaintiff's care after Dr. Huskins received the results of the neurological evaluation. Plaintiff continued to complain of pain and limited mobility. Despite this, no additional treatment appears to have been considered. When these facts are considered in conjunction with Plaintiff's assertion that after he was sentenced in September of 2009, Dr. Huskins stated the Plaintiff was no longer Benton County's problem, I believe there are genuine issues of material fact as to whether Dr. Huskins was deliberately indifferent to Plaintiff's serious medical needs. I also note that following his sentence, Plaintiff remained at the BCDC a significant period of time, until March of 2010.

With respect to the individual capacity claims against Sheriff Ferguson and Captain Holly, there is no evidence they made any decisions with regard to Plaintiff's medical care. See Clemmons v. Armontrout, 477 F.3d 962, 967 (8th Cir. 2007)(to establish personal liability of a supervisory defendant, plaintiff must show personal involvement in, or direct responsibility for, deprivation of constitutional rights); Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997)(prison official not involved in treatment decisions made by medical staff cannot be liable for medical staff's diagnostic decisions). Plaintiff did not speak to, or communicate directly with, Sheriff Ferguson about his requests for medical care. *Resp.* at ¶ 76(C). Instead, he seeks to hold Sheriff Ferguson liable because "[i]t happen[ed] in his jail." *Id.* This is not a sufficient basis for liability under § 1983. Estate of Rosenburg v.Crandell,

56 F.3d 35, 37 (8th Cir. 1995)(A warden's general responsibility for supervising a prison is insufficient to establish personal liability). Similarly, the Plaintiff spoke to Captain Holly on only one occasion and was referred to medical staff.

The official capacity claims also fail. Plaintiff has not shown the existence of an official policy or widespread custom or practice of unconstitutional conduct that caused the alleged deprivation of his constitutional rights. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 & n. 55 (1978).

### 4. Conclusion

For the reasons stated, I recommend that the summary judgment motion (Doc. 32) be granted in part and denied in part. Specifically, I recommend the motion be granted with respect to all claims against Sheriff Ferguson and Captain Robert Holly.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 25th day of August 2011.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)